## WHITE v. NEW YORK LIFE INS. CO.
### Civ. No. 3633.

United States District Court
N. D. Georgia, Atlanta Division.

Feb. 14, 1950.

Supplemental opinion April 11, 1950.

Lokey & Bowden, Atlanta, Ga., John H. Goodard, Griffin, Ga., for plaintiff.

W. Colquitt Carter, Bryan, Carter & Ansley, Atlanta, Ga., for defendant.

ANDREWS, Chief Judge.

This is a suit by Mrs. Ella L. M. White, as plaintiff, against New York Life Insurance Company, as defendant, to recover the face amount of $5,000.00 under a policy of insurance issued by the defendant, with interest from July 9, 1945, and in addition, the statutory penalty and attorneys fees provided by Georgia Law Code, § 56-706, for failure and refusal in bad faith to pay an insurance claim. The suit was originally filed in the Civil Court of Fulton County, Georgia, and removed to this Court by the defendant. After answer was filed by the defendant, the parties entered into a stipulation as to substantially all of the facts material to the controversy. Subsequently a second stipulation of facts was made by the parties and filed in the case. Both parties thereafter made motions for summary judgment. In support of her motion for summary judgment the plaintiff filed three affidavits with the Court supplementing the facts stipulated by the parties. The motions for summary judgment came on for hearing on January 6, 1950, at which time both parties filed briefs in support of their motions. After hearing argument, the Court took the motions under advisement.

In accordance with Rule 56 of the Rules of Civil Procedure, 28 U.S.C.A., the Court, on the basis of the pleadings, the stipulations of facts and the affidavits, which were not controverted, finds the following facts to be without substantial controversy:

New York Life Insurance Company, under date of March 28, 1944, issued a policy of life insurance, No. 18, 603, 340 to Louella White, in the principal sum of $5,000.00. The beneficiary under said policy was the plaintiff, Mrs. Ella L. M. White.

The policy was received in the Atlanta Branch Office of the defendant on March 31, 1944, and some time thereafter was delivered to the insured. The insured on April 1, 1944 became a member of the Army Nurse Corps and on that date entered upon the performance of her duties as such, continuing as such until the time of her death on April 29, 1945.

The policy of insurance was issued by the defendant, New York Life Insurance Company with knowledge on the part of the company that the insured, Miss Louella White, had been accepted for duty in the Army Nurse Corps and the policy was actually delivered to her after the insured had entered upon the performance of her duties as a member of the Army Nurse Corps.

As a part of her application for insurance, which became a part of the policy contract, the insured was asked the question: "What Selective Service Classification has been given you?". Her reply was: "1–A Army Nurse Corps". In response to the question "Are you now in, or do you plan to join or enlist in, the Army, Navy, Marine Corps, Coast Guard, Air Corps, Civil Air Patrol, Officers Reserve Corps, R. O. T. C., or any other military or naval organization of this or any other country?" the insured replied: "Accepted for Army duty nursing on April 1, 1944—will report to Camp Rucker, Ala, for 1 Month; from there to Camp Blanding, Fla."

The quarterly premiums of $40.80 due under said policy on March 27, 1944, June 27, 1944, September 27, 1944, December 27, 1944, and March 27, 1945 were paid and were received by the New York Life Insurance Company. At the time of the death of the insured all premiums required to keep the insurance in force had been paid to and receipted for by the New York Life Insurance Company.

The insurance policy provides that it is free of conditions as to residence, travel, occupation and military or naval service except as provided by the Additional Conditions Relating to War and Aviation. The pertinent provisions of the Additional Conditions Relating to War and Aviation are: "The only amount payable under this policy shall be the restricted amount hereinafter defined if the death of the Insured shall occur under the circumstances set forth in any one or more of the following clauses (1), (2), (3) or (4), namely (1) outside the Home Areas while the insured is in the military or naval forces of any country engaged in war; * * * or (4) within two years from the date of the issue of this Policy as a result of war, provided the cause of death occurs while the Insured is outside the Home Areas and the Insured dies either outside the Home Areas or within six months after returning to the Home Areas."

Clauses (2) and (3) have no applicability to the present case and defendant in its answer (Paragraph 14) relies only upon the provisions of Clause (1). The restricted amount is defined to be: "A sum equal to the premiums which shall have fallen due hereunder prior to the date of death of the Insured and been paid to and received by the Company, together with compound interest at the rate of three per cent per annum, plus the reserve on any outstanding dividend additions, and any outstanding dividends, including dividend deposits, and less any indebtedness thereon."

"Home Areas" is defined in the policy as "the forty eight states of the United States of America, the District of Columbia, the Dominion of Canada and Newfoundland."

The policy further provides that: " 'Military or naval service' includes service in the air forces of a country, including air training forces and forces charged with the operation or maintenance of any kind of aircraft, and 'military or naval forces' includes any such air forces;"

Except for the above provision, and the reference to various military organizations in the application, referred to heretofore, the policy contains no definition of the terms "military or naval service" and "military or naval forces".

On April 29, 1945, the insured, Louella White, was serving as a member of the Army Nurse Corps attached to the 176 Station Hospital, APO No. 244, which was a United States Army Hospital located on Saipan Island in the Pacific Ocean. As a

member of the Army Nurse Corps Miss White was a non-combatant, was not allowed to bear arms of any kind under any circumstances and could not be called to do duty in the field as a combatant.

On April 29, 1945, the insured, Miss Louella White, accompanied by her escort, Lt. William Moreman, an officer in the United States Army, left the 176 Station Hospital on Saipan Island to go to a nearby Air Corps Officers' Club for recreation, dancing and entertainment. The insured and her escort were waylaid and overtaken by three sailors who were citizens and subjects of the United States and were members of the United States Navy serving on Saipan Island and in connection with the plan of the three assailants to commit robbery and criminal assault upon the insured, the insured, Miss Louella White and her escort, Lt. William Moreman, were shot and killed by the three Negro assailants.

At the time of the death of the insured the Island of Saipan had been secured by the military forces of the United States and all fighting between the American and Japanese forces on the Island of Saipan had ceased. At the time of the death of the insured the American installations on the Island of Saipan were extensive. Hospitals and other installations had been set up in permanent buildings. Individual houses of a permanent character had been erected for officers quarters. Barracks and bachelor officers quarters of a permanent nature had been constructed. Numerous roads on the island had been paved or hard-surfaced. There were a large number of nurses attached to the hospital facilities on the island and there were also women Red Cross workers and field representatives located on the island, some of which were attached to the same hospital as the insured. Outdoor motion pictures were regularly shown at night. Electric lights were in general use on the island and no blackout procedures were in effect. The various military organizations on the island had their own officers clubs and recreational facilities, many of which were located in permanent-type buildings where informal dances were frequently held and it was customary for nurses and Red Cross work-

ers to attend. In general, in April of 1945, the life and activities of the Americans on Saipan was hardly distinguishable from that on a military base in the United States.

The insured went overseas and outside the Home Area as defined by the insurance policy sometime between June and September of 1944. From September, 1944 until the time of the death of the insured on April 29, 1945, her brother, W. C. White, paid all the quarterly premiums due on the policy. At the time the quarterly premium was paid in September, 1944, the defendant company wrote a letter to W. C. White, at his home in Griffin, Georgia, acknowledging the payment of the quarterly premium due on the policy on September 27th. The official premium receipt of the company, bearing the signature of the president of the company, was enclosed in the letter.

On December 20, 1944, W. C. White sent to the defendant a money order for $40.80 to cover the quarterly premium due on the policy on December 27, 1944. He did not receive the company's official premium receipt, and on January 31, 1945 White wrote to the defendant company and asked for a receipt by return mail. In reply, White received a letter from the company dated February 7, 1945, acknowledging his remittance of the December premium and advising him that the receipt had been sent to the insured at Camp Blanding, Florida, which was the address the company had on file and that the receipt had not been returned for non-delivery. The defendant company then proposed that in the absence of the receipt, the instant letter serve as an acknowledgment that the premium on the policy had been paid in advance to March 27, 1945. The letter then concluded with the request—"If the insured's address should be changed from that above kindly advise."

In response to the company's letter, White wrote and mailed to the defendant a letter dated February 28, 1945, in which he said: "I am writing in further reference to the above mentioned policy. You stated in your letter of February 7 if the policy holder had changed her address from Regional Station Hospital, Camp Blanding,

Florida to advise you to that effect. Her present address is Lt. Louella White, 176 Station Hospital, APO No. 244, c/o Postmaster, San Francisco, California. Since she has been sent overseas I have been taking care of this insurance policy for her and will ask that you please mail all receipts for her direct to me here."

The defendant received the above letter from White, and thereafter sent to him a notice that a quarterly premium would be due on the policy on March 27, 1945. On March 20, 1945 White sent a money order to defendant for the quarterly premium, at the same time returning the premium notice as requested by the defendant. Thereafter, the defendant company issued its regular premium receipt, bearing the signature of the president of the company, for the quarterly premium due on the policy March 27, 1945 and mailed it to White in Griffin, Georgia.

The address—176 Station Hospital, APO No. 244, c/o Postmaster, San Francisco— was the address of the hospital on Saipan Island where the insured was stationed at the time of her death.

The defendant, after knowledge that the insured was overseas and beyond the "Home Areas" as defined in the policy of insurance, and after notice that during her absence the insured's brother was taking care of the policy, demanded and received the full quarterly premium due on the policy March 27, 1945.

On July 9, 1945 defendant advised plaintiff that the death of her daughter, the insured, resulted from causes within the limitations of the "Additional Conditions Relating to War and Aviation" and that the limit of its liability under the policy was the restricted amount in the sum of $208.83. Thereafter the defendant tendered to the plaintiff a check for $208.83, the restricted amount of a sum equal to the premiums which had fallen due and been paid on the policy prior to the death of the insured, together with compound interest at the rate of 3% per annum, plus the reserve on any outstanding dividend additions and any outstanding dividends, including dividend deposits.

Under the terms of the policy, participation in surplus and the right to dividends would not begin until the end of the second insurance year, while the right to cash surrender value or paid up insurance would not begin until after three full years' premiums had been paid.

The plaintiff did not accept defendant's check in the sum of $208.83 in settlement of her claim under the insurance policy and it was subsequently returned to the defendant.

Thereafter, on February 25, 1949, plaintiff's attorneys wrote to defendant demanding payment of the face amount of the policy in the sum of $5,000, plus interest at the rate of 7% per annum from July 9, 1945, the date upon which the defendant first declined to pay said claim.

Thereafter, on May 20, 1949, this suit was filed in the Civil Court of Fulton County, and subsequently removed by the defendant to this Court.

The pleadings, stipulations and affidavits show that there is no genuine issue as to any material fact except upon the question of bad faith charged to the defendant insurance company in refusing to pay the plaintiff's claim. Based upon the pleadings, the stipulations and the uncontroverted affidavits, the motion of the defendant for summary judgment is denied.

The pleadings, the stipulations and the uncontroverted affidavits show that there is no genuine issue as to any material fact relative to the right of the plaintiff to recover the face amount of the policy sued on and the Court finds as a fact that defendant is indebted to the plaintiff under the terms of the policy in the sum of $5,000, with interest thereon at 7% per annum from July 9, 1945. As to said face amount of the policy, with interest, plaintiff is entitled to a judgment against defendant as a matter of law. Therefore, the motion of the plaintiff for summary judgment is sustained as to the right of the plaintiff to recover the face amount of the policy, $5,000, with interest thereon at the rate of 7% from July 9, 1945, the first date upon which the defendant refused to pay the plaintiff's claim.

However, there being facts in controversy relative to the question of bad faith on the part of the defendant in refusing to pay the plaintiff's claim, and the plaintiff having made no motion for summary judgment upon this phase of her case, judgment cannot be rendered at this time upon the whole case, and it is therefore ordered that the case be set down for trial by a jury upon the single issue of the bad faith of the defendant in refusing to pay the plaintiff's claim, it being a matter for the jury to determine whether the defendant is guilty of such bad faith as to justify the imposition of the statutory penalty provided by Georgia law, and further, should the jury determine that the defendant did act in bad faith, then it is for the jury to determine what, if any, attorneys fees the defendant shall be required to pay to plaintiff and her attorneys.

Upon the determination of these issues by the jury, judgment will be entered in favor of the plaintiff for the principal sum of $5,000, interest at 7% per annum from July 9, 1945 to the date of judgment, plus such further sums as the jury may find to be due as statutory penalty and attorneys fees, should the jury determine the defendant to have acted in bad faith.

Let the case proceed in accordance with the above order.

### On Granting Motion for Summary Judgment in Favor of Defendant as to Penalty and Attorneys Fees.

In paragraph 21 of the complaint, recovery is sought of the sum of $1,250 as a statutory penalty of twenty-five per cent for acting in bad faith and refusing to pay the principal loss of $5,000, and for the further sum of $1,500 as reasonable attorneys fees.

The Court adopts the statement of facts contained in the stipulation of November 26, 1949, and the order granting summary judgment in favor of the plaintiff as to the principal amount filed on February 14, 1950. Since the entry of summary judgment in favor of plaintiff's principal claim, defendant has filed a further motion for summary judgment as to the items of penalty and attorneys fees above specified.

The latter motion was heard on the 7th day of April, 1950. The Court is of the opinion that there was reasonable ground for contesting the claim and finds that there is no evidence of frivolous or unfounded refusal to pay, and further that the question of liability is a close one as the case presents complex questions of law not heretofore passed on so far as the Court is advised.

It Is Therefore Ordered and Adjudged that the prayers for the statutory penalty and attorneys fees as prayed for in paragraph 21 of the complaint be and the same are disallowed and denied.